# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

ELGIN FAMILY COMPANY, L.L.C.,

    Plaintiff,

v.                                                                                                                                       No. 9-CV-1228 WJ

PARALOGIA ULTRA LOUNGE, L.L.C.,

    Defendant.

## AMENDED[1] MEMORANDUM ORDER AND OPINION GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER comes before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 10). Plaintiff asks this Court to enter an order enjoining Defendant from creating a noise nuisance or violating any applicable Oklahoma City noise ordinances. The Court finds that Plaintiff has met the standard for a preliminary injunction and GRANTS Plaintiff's Motion for a Preliminary Injunction. The Court, however, will stay the injunction for sixty (60) days from the date of this Order. During this 60-day time period, the Court will require additional briefing from the parties on the precise scope of the injunction as well as whether the Court should require a bond.

## BACKGROUND

Defendant Paralogia Ultra Lounge, L.L.C. ("Paralogia") operates what it describes as a Las Vegas style wine and martini lounge on the first floor of a mixed-use building in the

---

[1] In the last paragraph of the original order, the Court misstated the due date for the Defendant's reply brief. The Defendant's reply brief is due on April 12, 2010—not March 12, 2010 as the original order inadvertently stated.

Bricktown area of downtown Oklahoma City. The first floor of the building houses restaurants, bars and retail shops, while the second, third and fourth floors are comprised of residential condominium units. The entire mixed-use building is owned by Centennial on the Canal, LLC ("Centennial") from whom Defendant leases the space for its lounge. Centennial, in turn, is owned by three members: Hogan Property Ownership (which owns 50%), Plaintiff Elgin Family Company (which owns 45%), and David Harper (who owns the remaining 5%). Plaintiff Elgin Family Company, LLC, also owns Condominium 209—the condominium directly above Defendant's business. Plaintiff asserts that Defendant creates an unreasonable volume of noise from 10:00 p.m. to 2:00 a.m. The noise, Plaintiff asserts, is plainly audible in its condominium, causes windows and pictures on the wall to shake, and prevents Plaintiff's owners from using or enjoying Condominium 209. Plaintiff also claims that Defendant is violating Oklahoma City noise ordinances. In response, Defendant asserts that Plaintiff—as a 45 percent owner of Centennial—knew that Defendant intended to open a wine and martini lounge, knew that Defendant planned to employ a disc jockey ("DJ") to play loud music beginning at 10:00 p.m. and implicitly approved Defendant's plans by permitting it to lease the space. Defendant argues that Plaintiff cannot obtain an injunction for a situation which it helped create.

<u>The Lease Agreement</u>. In 2008, Paralogia entered into a five-year lease with Centennial, the owner of the mixed-use building. Randy Hogan, the managing partner of Centennial, conducted the lease negotiations on behalf of Centennial, and Doctors Keith and Ashleigh Muse, Paralogia's owners, conducted the negotiations on behalf of Paralogia. During the negotiations, the Muses specifically asked Centennial about potential noise issues. They showed Centennial their plans for the leased space, which included a DJ stand, and informed Centennial that the DJ would turn up the music's volume beginning at 10:00 p.m. Randy Hogan assured Keith Muse in

2

a light-hearted email that he did not anticipate any problems with noise. *See* Exhibit 15 ("I have a phone call into [Mr. Elgin] and don't anticipate any concern about your concept being below his space. After a few glasses of wine I am more concerned he will keep your customers up—just kidding . . . kind of."). To further assuage the Muses's concerns, the parties modified language in the Lease to read: "Tenant acknowledges that residents live above the Leased Premises, therefore, Tenant will *make best efforts to* not make nor permit any unseemly or disturbing noises to be made which emanate from the Leased Premises or which otherwise disturb or interfere with other tenants of the Building . . . ." Lease Agreement, Schedule 10, at 2 (emphasis added). The first draft of this provision required the Tenant to refrain entirely from creating any disturbing noises; the revised provision only required the Tenant to make "best efforts" not to disturb the residents.

The Lease also incorporates by reference another document entitled the Declaration of the Centennial Unit Ownership Estates ("Declaration"). The Declaration is a voluminous document filed of record on February 28, 2008 with the Oklahoma County Clerk's Office which governs the entire Centennial building. Attached to the Declaration as Exhibit "I" are the Rules and Regulations of the Centennial Owners Association. Article Seven of that exhibit addresses noise and nuisances. It states, in relevant part: "All Owners and occupants shall avoid excessive noise of any kind at any time and shall consider the quiet enjoyment of other Owners and occupants of the Property at all times. . . . [R]adios, stereo and television sets, and any and all other such audio equipment generating noise in excess of forty (40) decibels should be turned down to a minimum volume so as not to disturb other occupants between the hours of 10:00 p.m. and 8:00 a.m." While the Muses read the Lease Agreement, they did not read the referenced Declaration, nor was the Declaration part of the oral negotiations between the parties. However,

as noted above, the Declaration was duly recorded with the county clerk and accessible to the public.

    Oklahoma City Noise Ordinances. The Oklahoma City noise ordinance regulates noise from an establishment such as Defendant's in three different ways. First, the ordinance generally prohibits "any excessive, unnecessary or unusual noise disturbance or any noise which either annoys [or] disturbs" a reasonable person of normal sensitivities. Oklahoma City Municipal Code § 34-3. The ordinance defines a "noise disturbance" as any plainly audible sound where the listener can clearly hear the content of the sound. *Id.* § 34-2(21). Second, the ordinance forbids any sound which exceeds specified decibel levels. *Id.* §34-6(a)(2). The permissible decibel levels vary depending on the establishment's zoning designation and the time of day. For example, commercial establishments (zoned C-1 through C-4) may not produce sound in excess of 70 decibels before 10:00 p.m. From 10:00 p.m. to 7:00 a.m., commercial establishments may not produce sound in excess of 65 decibels. *Id.* § 34-12. Finally, the ordinance prohibits huge variances in sound. Specifically, there must be less than a 15 decibel difference between the baseline noise level in a particular place and the loudest 1 percent of noise. *Id.* § 34-6(a)(1).

    Before opening for business, Paralogia requested permission from the City for a special zoning designation or SPUD (which stands for "special planned unit development."). Such a designation was necessary in order for Paralogia to sell alcohol within fifty feet of private residences. When a business obtains a special zoning designation, the Director of the Public Works Department must decide which zoning classification the business should receive for purposes of the noise ordinance. *Id.* § 34-12 ("The Director of the Public Works Department shall make a determination on . . . SPUD . . . zoning districts as to their classification."). As of

4

this writing, the Director of Public Works has not yet determined which zoning classification Paralogia should receive.

Instant Action. Paralogia finally opened for business on March 7, 2009. Three months later, in mid-June, Paralogia began receiving complaints from residents about the noise level. On November 5, 2009, Plaintiff filed this suit claiming that Defendant's actions constitute a nuisance and requesting injunctive relief and monetary damages. Plaintiff requests damages for the reduced value of its condominium[2] as well as the loss of the use or enjoyment of its condominium. A month later, Plaintiff and Centennial filed state law claims against Defendant in Oklahoma County District Court. The state court case has been temporarily stayed and Plaintiff has now filed this Motion for a Preliminary Injunction.

## DISCUSSION

### I. Whether a Preliminary Injunction Should Issue

To obtain a preliminary injunction, the moving party must establish four requirements: (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the relief is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the injunction; and (4) the preliminary injunction, if issued, is not adverse to the public interest. *See* FED. R. CIV. PRO. 65; *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir.2001); *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 854 (10th Cir.1995) (citation omitted). If the plaintiff fails to meet its burden on even one of the requirements for a preliminary injunction, the court should deny the request for injunctive relief. Likewise, because a preliminary injunction is an

---

[2] Plaintiff's condominium has been on the market since February 2009. It was originally listed at $549,900, but Plaintiff has twice lowered the price to the current listing price of $439,000. Plaintiff has also been forced to disclose to potential buyers the noise nuisance coming from Paralogia.

extraordinary remedy, the right to relief must be clear and unequivocal. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) (internal quotation omitted). Finally, when determining whether the plaintiff has met its burden, the court applies the law of the forum state. *Mid-America Pipeline v. Lario Enterprises*, 942 F.2d 1519, 1523 (10th Cir. 1991).

A.  <u>Likelihood of Success on the Merits</u>

First, Plaintiff has met its burden of showing a likelihood of success on the merits. Under Oklahoma law, an action constitutes a private nuisance if: (1) it invades another person's interest in their use and enjoyment of property; and (2) the invasion is both intentional and unreasonable. *Nichols v. Mid-Continent Pipeline Co.*, 933 P.2d 272, 277 (Okla. 1996); RESTATEMENT (SECOND) OF TORTS §822. Furthermore, whether noise constitutes a nuisance depends on all the circumstances—including the character and volume of the noise, the time and duration of its occurrence, and the number of people affected by it. *Smilie v. Taft Stadium Bd. Of Control*, 205 P.2d 301, 304 (Okla. 1949).

At the hearing, Plaintiff presented uncontested evidence that the noise coming from Paralogia is unreasonable. Several witnesses who own or use condominiums on the second floor of the Centennial building testified that the noise was unbearably loud from 10:00 p.m. to 2:00 a.m. Plaintiff represented that during those hours the noise from Paralogia causes the windows in their condominiums to shake, pictures on the wall to vibrate and glasses in kitchen cabinets to vibrate. Mr. Elgin testified that "I could not listen to my TV in my living room, because the noise coming from Paralogia was so intense that I just basically couldn't listen to it." Several witnesses also testified that it is impossible to sleep until the music ends around 2:00 a.m. The witnesses with alternate accommodations no longer stay overnight in their condominiums when

Paralogia is open.

In order to determine exactly how much noise Paralogia was generating, Plaintiff hired Mr. Scott Vincent, an industrial hygienist, to conduct a noise assessment study. Mr. Vincent measured the sound from the living room of Condominium 209 after 10:00 p.m. and found that the sound level generally hovered between 52 and 54 decibels. Environmental Noise Assessment Report, Ex. 19 at 3. Ten percent of the time, the sound exceeded 55 decibels. In instantaneous moments, the sound exceeded 100 decibels. In the stairwell outside Condominium 209, the noise levels were much louder. They generally hovered around 63 or 64 decibels, but exceeded 67 decibels ten percent of the time and peaked at more than 120 decibels. *Id.*

Paralogia does not dispute that the music is very loud and can easily be heard in the condominiums on the second floor. Rather, Paralogia argues that the noise level does not rise to the level of "actual physical discomfort." *Smile*, 205 P.2d at 304 (quoting 37 AM. JUR. § 47) ("To render a noise a nuisance, it must be of such a character as to be of actual physical discomfort to persons of ordinary sensibilities. . . . [N]oises which constitute a mere inconvenience or trivial annoyance do not warrant the abating of a useful business."). The Court disagrees. At least four witnesses testified that they could not sleep in their condominiums when Paralogia was playing loud music. Surely, the inability to sleep in one's home constitutes actual physical discomfort. Paralogia did not produce a single witness to testify that the music coming from Paralogia was actually not that loud or that sleeping was not a problem while the music continued. In short, the witnesses who own or use condominiums above Paralogia have lost the use and enjoyment of their condominiums. For these reasons, the Court finds it likely that Plaintiff will succeed on the merits of its nuisance claim.

B. <u>Irreparable Injury</u>

Second, Plaintiff has shown that it will suffer irreparable injury unless the injunction issues. As long as Paralogia continues to produce excessive noise, Plaintiff cannot use its condominium—at least, not overnight. Plaintiff cannot be fully compensated by money damages for the loss of the use of its condominium. *See RoDa Drilling Co. v. Stiegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Furthermore, any attempt to assign value to the loss of the use of Plaintiff's condominium will necessarily involve guesswork. *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (irreparable harm may exist where it is impossible to calculate the amount of damages precisely). The Court would have to attempt to calculate the value to Plaintiff of using its condominium overnight for a set period of time. Paralogia points out that the reduced value of Plaintiff's condominium is easily calculated by reference to the sale price, but argues dismissively that "any other claim of irreparable harm is not supported by the evidence." Paralogia may be correct that the court could determine the reduced market value of the condominium, but that would only compensate Plaintiff for part of its injuries. *See* Tracy A. Bateman, Annotation, *Nuisance as Entitling Owner or Occupant of Real Estate to Recover Damages*, 25 A.L.R. 5th 568 (noting that plaintiffs in a private nuisance action may seek compensation for personal inconvenience, discomfort, or annoyance in addition to damages for depreciation in value of property or its use.") In addition to compensation for the reduced value of the condominium, Plaintiff may also obtain damages for the loss of the use of its condominium and such damages are not easily compensable by money alone.

C. Balance of Equities

Third, the court finds that the continued loss of the use of Plaintiff's condominium outweighs the harm to Paralogia in keeping the volume to a reasonable level. Paralogia claims that turning the music off will "destroy ambiance" and cause it to lose business. However,

Plaintiff is not asking Paralogia to turn the music off entirely; rather, Plaintiff merely wants Paralogia to keep the noise at a reasonable level that does not disturb those who reside upstairs. Paralogia did not put forth any evidence suggesting that keeping the music at reasonable levels would cause it to lose business. In its brief, Plaintiff alleges that, according to Paralogia's accounting statements, Paralogia earned its highest profits in April 2009 before the noise complaints began. Reply Br. at 8. Paralogia also did not suggest that it would be prohibitively expensive to soundproof the walls in order to maintain the current volume without disturbing the residents upstairs. On the other hand, Plaintiff offered testimony that numerous persons who lived above Paralogia could not sleep or otherwise enjoy the condominiums because of the late-night noise from Paralogia.

Paralogia points out, correctly, that Plaintiff uses the condominium infrequently. Mr. Mark Elgin (Plaintiff's managing partner) lives in Alabama and only stays in the condominium two or three nights out of every month when he travels to Oklahoma for business. Mr. Elgin testified that his colleagues occupy the condominium another five or six nights per month and that guests and friends occupy the condominium on occasion. Plaintiff also alleges that it "would make more use of the condominium if anyone could stay there and get a decent night's sleep." Reply Br. at 4. Paralogia makes much of the fact that Plaintiff uses the condominium infrequently and argues that any noise produced by Paralogia cannot therefore constitute an unreasonable burden on Plaintiff. The Court disagrees. Plaintiff currently uses the condominium for at least a week every month—which is not an insignificant amount of time. Whenever Plaintiff uses its condominium, its guests cannot sleep or otherwise enjoy the condominium between 10:00 p.m. and 2:00 a.m. *Compare Smilie*, 205 P.2d at 303 (holding that racetrack did not constitute a nuisance because the races lasted less than 20 minutes and only

occurred once a week) *with Anne Arundel Co. Fish & Game Conservation Ass'n v. Carlucci*, 573 A.2d 847 (Md. App. 1990) (holding that gunfire from shooting range which occurred between 9:00 a.m. and 9:00 p.m. seven days a week constituted a nuisance to nearby residents). Furthermore, Plaintiff represents that it would use the condominium more often if the noise levels were not so obnoxious. Given these facts, and the fact that Paralogia did not put forth any evidence of the cost it would incur if required to comply with an injunction, the Court finds that the equities weigh in Plaintiff's favor.

D.     Public Policy

Finally, any injunction which forbids Paralogia from producing unreasonable noise levels would not be adverse to the public interest. Paralogia could continue to operate its lounge without creating a nuisance. On the other hand, numerous condominium owners in the Centennial building have registered noise complaints against Paralogia. Enjoining Paralogia from producing unreasonable noise levels is not adverse to the public interest.

**II.     Scope of Injunction & Bond Requirement**

Because the Plaintiff has proffered sufficient evidence to show all four requirements, the Court will issue a preliminary injunction against Paralogia. However, the Court continues to harbor concerns about the scope of the requested injunction. Plaintiff requests an injunction that prohibits Paralogia from creating "excessive, intense, annoying noise nuisances or violating applicable noise ordinances." Plaintiff's Motion at 6. At the hearing on this matter, the Court expressed concern about the validity of such an imprecise injunction and asked whether the Plaintiff would prefer that any injunction forbidding Paralogia from exceeding specified decibel levels. The Plaintiff opposed that form of injunction, arguing instead for an injunction which merely forbids Paralogia from producing unreasonable noise levels.

10

The Court is reluctant to issue such a vague injunction without further briefing from the parties. Rule 65(d) of the *Federal Rules of Civil Procedure* requires all injunctions to "be specific in terms" and "describe in reasonable detail . . . the act or acts sought to be restrained." The Second Circuit recently vacated an injunction in a noise nuisance case because the injunction was too vague. *Howard Opera House Associates v. Urban Outfitters, Inc.*, 322 F.3d 125 (2d Cir. 2003). In that case, the district court enjoined the defendant from making noise that "substantially and unreasonably interferes with other tenants' use of their space" or "unreasonably disturb[s] other tenants." *Id.* at 130. The Second Circuit held that the injunction "lacks the 'reasonable detail' required by the rule" and remanded to the district court to redraft the injunction more precisely. *Id.* The injunction requested by the Plaintiff in this case is substantially similar to the injunction struck down by the Second Circuit.

The Court realizes that an injunction which specifies a decibel level is not free from problems either. Oklahoma City has yet to specify which decibel level in the Municipal Code should apply to Paralogia. One option is for the Court to enjoin Paralogia from exceeding the most lenient decibel level in the Code on the condition that, if the City assigns Paralogia a more stringent classification in the meantime, such classification will control. On the other hand, Plaintiff may argue that such an injunction, while forcing Paralogia to comply with Oklahoma City noise ordinances, may not solve the nuisance problem. The Court will require the parties to flesh out these issues in supplemental briefing.

In addition, the parties shall submit additional briefing on whether the Court should require Plaintiff to post a bond. Rule 65(c) of the *Federal Rules of Civil Procedure* states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained." While the Court is not required to issue a bond, it must "giv[e] consideration to whether the circumstances of a particular case justify the unusual practice of leaving the enjoined party bereft of security." *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461 (10th Cir. 1987). Therefore, the parties shall brief the Court on whether a bond should issue and, if so, what amount would be appropriate security for the Defendant.[3]

## CONCLUSION

For the reasons given above, the Court GRANTS Plaintiff's Motion for a Preliminary Injunction. However, the operative effect of the injunction shall be stayed for sixty (60) days from the date of this order. The Plaintiff shall submit additional briefing to this Court in the form of a Motion regarding the scope of the injunction and whether the Court should require a bond. Plaintiff's Motion shall be due on Monday, March 15, 2010. Defendant's response shall be due on Monday, March 29, 2010, and Plaintiff may file a reply no later than Monday, April 12, 2010. The Court will consider the parties' additional briefing and issue a supplemental order before the injunction takes effect.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE

---

[3] Defendant, through its counsel, acknowledged on the record at the conclusion of the preliminary injunction hearing that it would request a bond in the event the Court determined that an injunction should issue.